We'll begin and hear argument in 2850 Grand Island Boulevard versus NLRB. Mr. Godfrey, I understand your colleague is not well. We hope he recovers quickly. Welcome. Thank you. Received a call less than an hour ago from my midtown office, ran down here, picked up the papers, and I'm here before you. So, I litigated the case below. I'm familiar with the facts. I had not prepared for argument today, but will do the best that I can to address the issues on appeal before this court. Sure, you'll do fine. Thank you. This matter presents a question of whether certain charge nurses or team leaders, as they were called, were supervisors or employees under the National Labor Relations Act. It's appellant's position that these individuals were supervisors. Under the law, there are a number of factors in the definition of supervisor under the National Labor Relations Act. It's necessary that a person only perform one of those elements in order to be considered a supervisor for purposes of the law. It's appellant's position that the record contains extensive evidence of a number of the key points that establish supervisory status. I have a question, just to clarify where we're starting. You used the term team leader a minute ago. Yes, Judge. Are all of the LPNs team leaders? In other words, are there certain of them that you're claiming are team leaders? At this particular facility, all of the LPNs are team leaders. There were, if memory serves, about 17 of them in total that supervised a group of about more than 100 other employees. You say supervised, that presupposes the question, but what is the team? What's the team that they supervise on a day-to-day basis? LPN? The team leader, you're using a term team leader. The other side doesn't use that term. And I wanted to know what constitutes the team that is being led. Sure, I can address that, Judge. The team leader is the job description that's contained in the facility. It is the actual job description that was used, and there's evidence in the record that that's the title by which LPNs were called. They weren't called LPNs, they were called team leaders, and that's the job description. But the folks that the- They're interchangeable, the term is interchangeable. They all were required to have certification as licensed practical nurses, LPNs. But the category in which they occupy at this particular employer is that of a team leader. Are all LPNs, sticking with the same question or set of issues that Judge Walker is raising, are all LPNs team leaders? At this particular facility, the answer is yes. All of the individuals- Do team leaders ever lead LPNs? So you have team leaders leading team leaders. Or is there a distinction between some who actually are team leaders, because they have some LPNs under them, and other people who aren't nurses? Judge, at this facility, the way that it works, there's a team that constitutes sort of a nursing unit or a wing, if you will, in a nursing home. And that wing, on a day-to-day basis, includes a large number, a larger number of certified CNAs, certified nurse assistants, five plus, it includes housekeeping and dietary and other folks. The team leader is the person who is sort of the quarterback of that team on a day-to-day basis, making decisions with respect to the assignment of work of the CNAs, and addressing issues that arise. Let's be very clear, there's a supervisor in charge of everything, both floors. There are two floors here, right? Sometimes, Judge. Sometimes there's not. At many times a day, the team leader, and there's testimony- I'm just talking about, if you were to draw a chart of the positions. There's, I believe from the record, there's a person who's, one person who sort of sits on top of the whole thing. And then there's somebody on each, and that person may have a deputy. And then on each floor, there's also a person who's a senior person on each floor. Assigned to each floor. Is that correct? Not always, Judge. So what happens over the course of the day when the nursing home is fully operational is an administrator. There's a director of nursing on site who oversees the whole building. There are nurse supervisors- That's the one I'm thinking of. Yeah, who oversee different aspects of it. But in terms of running the unit on a day-to-day basis, the specific floor for the vast majority of the day, in addition, overnight evenings, those supervisory employees don't work. There are times when an LPN is the top employee. An LPN team leader is the most senior person who's in the building. At night, from time to time when there isn't a nurse supervisor on duty, that can be the case. During other times when a nurse supervisor is on duty, the LPN team leader is still the person who's effectively responsible for managing the operations in the particular unit. They do not check with the nurse supervisor or director of nursing or administrator with respect to any of the assignments that are provided on a day-to-day basis. They make assignments like all of the folks who are floated into a wing on a particular, into their unit on a daily basis. They tell them where to go. What I understood was that there were assignments, fixed assignments, but the LPNs could change those assignments. That's not entirely true either. I know that that's the argument that was made, that the argument was effectively by the other side. That these folks basically do the same thing every day. That's really not the case. There's assignment of rooms, which basically dictates what a subordinate CNA does throughout the course of the entire day. And that those initially are made by the team leaders, and then whenever issues come up, like about half the staff on the unit each day are folks that are part-time or temporary folks who are floated into the unit. So the assignment of the LPNs to those rooms, I'm sorry, of the CNAs to take care of those patients really dictates what those patients do, what those CNAs do throughout the course of the entire day. So are there LPNs who are under LPNs in this scenario you've laid out? No, there's not. So there'd be one LPN who's the key person on the wing during the time period at issue or on the floor, and they're going to make all these decisions. When CNAs get moved to a floor for whatever reason, the LPN is going to decide, you're going to take Mrs. Jones, you're going to take Mrs. Smith, and that dictates a significant portion of what the, based upon the patient acuity and all kinds of other things. What's our standard of review for reviewing the board's determination here? I think that substantial evidence- Fact or question of law, mixed question of fact and law in your view. I think it's a mixed question of fact and law. I think that the facts established in the record clearly have lots of elements of supervisory status. There are papers detail specific chapter and verse contained in the records. For example, with respect to the ability to direct, Mr. Mabaki, who's a LPN team leader, testified that he makes assignments on a day-to-day basis. He decides based upon an LPN's, I'm sorry, a CNA's background, their abilities and skills on a daily basis to what patient they should be assigned to. And those assignments are a clean slate when a person floats to a particular floor. There is no precedent with respect to where they need to go. It's made 100% in that team leader's discretion as to where they should be assigned. At that moment, at that time? If we were to decide that LPNs are supervisors, what would be the consequence of that decision, particularly in view of the fact that the union won the election by a greater number than the number of LPNs who could have voted for it? A couple of things. First, LPNs should be excluded from the bar unit, not included in it. Second, LPNs should be treated as supervisory employees for purposes of campaigning, electioneering activity, engagement. And third, and most importantly under- But it would only be prospective things. Well, under Quinnipiac, what we would ask the court to do is to direct a new election. Is that the result of the election? Well, what we would ask the court to do is schedule a new election. Under Quinnipiac, this court's decision in Quinnipiac, where LPN, where supervisory employees are included in a unit and engage in substantial activity in relation to that activity, those- That's dependent upon the fact that you're saying that the supervisors acted, if they were supervisors, they acted inappropriately. The question maybe Judge LaValle's asking, and certainly I'm curious to know is, if you subtracted the LPNs from the vote that took place, would there still be enough to support the union? There would numerically. Two consequences would arise, though. One, we've identified a number of campaigning and electioneering activity that would be inappropriate for a supervisor to have engaged in and objected to that timely. That wasn't raised below, was it? It was, that was raised below. Yes, those were objections to the election that were identified. And second, LPN team leaders played a significant part in the campaign activity that took place, and under such circumstances, under Quinnipiac, the court should set aside and order a new election altogether. I'm sorry, I should have said, isn't it at least argued that that wasn't raised in a timely fashion? There was such an argument, however, the stipulated election agreement at the very beginning of the case preserved the employer's right to argue that LPN team leaders were supervisors. And there were objections that were raised following the election with respect to activities that they had engaged in, contending that wasn't, contending that that was not appropriate conduct for a supervisor to have engaged in. With respect to the individual issues, Judge Hall was asking you about the standard. If I understand correctly, all that's needed to sustain the board's decision is substantial evidence in support of it, regardless whether we would agree with it or not. Is that correct? That is correct, Judge. However, we do believe that there is, all the court needs to do, not I believe, the law is black and white. If this court were to agree that in the record there is just one of the various elements that establish supervisory status, and we believe that there is more than ample evidence in the record in that regard, the appropriate result would be to- Yes, but what if there is at best one instance of an LPN acting in a manner that would be consistent with a supervisor? That evidence cannot be overlooked, Judge. I mean, the record, as long as they've got the ability to do it, it establishes that these folks are in the capacity of making these types of decisions. And the evidence in the record was not just about me, it was about each of them testified. For example, John Mabachy's testimony was about what LPNs have the ability to do. There was extensive evidence in the record in this regard, Your Honor. One can have a situation, can't you, where the system is there, but to deal with emergencies and to deal with particular situations where there isn't somebody that everybody can agree is a supervisor present, that the LPN can't just sort of sit there and watch. I mean, circumstances require some management. And so there has to be a little play on the joints on that without them necessarily becoming supervisors. Well, the statute really doesn't afford that type of latitude. I mean, as long as they've got the ability to assign, to direct, to discipline, and the other items that we identified, they are supervisors. It doesn't matter that they use that power infrequently. The fact of the matter is they had the authority and did exercise the authority to do many of the things that are included in the statute. Testimony, do job descriptions come into the picture here? They absolutely do, Judge. The job descriptions specifically include key elements about how they're evaluated with respect to their ability to supervise their underlying personnel. For example, the job description and annual performance evaluation include items like directing and monitoring the duties of the subordinate employees that report to them, and- Are you reading from a particular page in the record now? Yes, that's on page 212 to 214 and 655 and 56 in the record on appeal. That cites some of the elements with respect to the performance evaluations and job descriptions in that regard. What was the last site, 6- Yeah, so it's 212 to 14 and 655 to 56. Thank you, Mr. Godfrey. You've reserved two minutes for rebuttal. We'll hear from Mr. Weitz. Good morning, Eric Weitz on behalf of the NLRB. I'd like to begin just by clarifying a couple factual issues which arose in the first half of the argument. First of all, your honor, with your question regarding the team leader LPN distinction. At the hearing, the terms were used interchangeably, but the unit that was actually certified by the board includes three different job classifications. There's LPNs, LPN team leaders, and LPN charges. And the employer failed to clarify at the hearing what the distinction between those are or how many of the 15 individuals at issue are one of those three. The second issue I wanted to clarify, which is very important, is kind of the hierarchy of the facility here. And contrary to my opposing counsel's statement, there's never an occasion when an LPN is the most senior nurse on site. And so the overall hierarchy is, first of all, you have an administrator at the top. And the record shows that the individual CNAs do go to the administrator to resolve issues. Below him, you have the director of nursing who's in charge of all nurses and who is not there all of the time. For example, at the evening overnight shift. But below her, you have an RN nursing supervisor who's responsible for both floors of the facility. And below her, you have an RN unit manager who's responsible for, there's two of them and they're each responsible for a given floor. And as the record shows, there's never an occasion where you don't have either an RN unit manager or an RN nursing supervisor on site. And so- That's a descending order of seniority, if you will, what you just laid out. Correct, and then below those managers or supervisors, you have LPNs who are in a sense considered more senior nurses than the CNAs. But LPNs have their own job duties throughout the day. They're not responsible for supervising nurses like these other employees. LPNs are performing their own duties in connection with caring for the residents of the facility. For example, they administer medication, they perform record keeping functions, they check the narcotics store each day. And so it's important to note that there always is a more senior nurse. When you say there always is, I can certainly understand your argument based upon the hierarchy you've given. But we're talking about 24 hours a day, and it looks to me like most of these jobs are eight hour a day jobs. In other words, from nine to five, I could see how this hierarchy might be in place. But what about the other 16 hours? Correct, your honor, there's three shifts. So there's a daytime shift, an evening shift, and an overnight shift. Yeah. And so you have different- You're not going to have the registered nurse in floor two there for 24 hours. Well, yes, your honor, it's different employees. So the director of nursing, for example, is not there 24 hours, because there's one director of nursing for the facility. But there are shifts of RN nursing supervisors and RN unit managers. So even during the overnight shift, there is either an RN unit manager or an RN nursing supervisor at the facility. So if an emergency arises- So the RN's called a supervisor. Correct. So for example, if a resident is experiencing pain or emergency arises and the CNA witnesses that, the CNA's duty is to go contact the more senior nurse, the LPN. But then the LPN is required to go and contact a manager or an uncontested supervisory nurse to resolve the situation. So the LPN's authority is limited to the situation where, say, someone is experiencing pain. Both the CNA and the LPN have indistinguishable duties there, which is to make the common sense decision. Just so I'm clear then, the nursing supervisor, there'd be at least three of them for the different shifts? Well, so your honor, so there's a unit manager and a nursing supervisor. So there may be times when only one of the two is there, but there's testimony which we cite in our brief from the LPNs and other employees that there's never an occasion where an LPN is the most senior person on site. So even overnight, if there's an emergency, there's someone more senior who makes the final call. And in fact, they're required to make the final call because virtually all of the care provided to residents is spelled out in a very detailed resident care plan, which both CNAs and LPNs are required to follow, and only the managers have the authority to modify that resident care plan. So an LPN cannot make a final decision that, for example, we're no longer going to- So is it the board's position that so long as there is somebody else senior, somebody who is also a manager can't be a manager? No, your honor, it's not that bright line situation. But in this particular case, what the evidence shows is that the LPNs are not making independent decisions on their own. So you could have a situation where you have multiple layers of authority and the less senior individual is making independent decisions. For example, in the Oakwood, the board's leading case, the Oakwood health care case, there you had charged nurses who were found to be supervisors and there was presumably more senior personnel. But those charged nurses had the responsibility for making independent decisions, using independent judgment during the day, for example, as patients came in. And medical decisions had to be made in their expertise of assigning those incoming patients to nurses based on skills, based on expertise. This case is different because the LPNs do not have that type of independent judgment. And for example, on the assignment factor, contrary to the opposing- Because Mr. Godfrey says all the board needs to have overlooked is one of those factors and then there's a problem, so. Correct, so on the assignment factor, there is insufficient evidence that these LPNs have any assignment authority. Because under the board's test, which this court is required to defer to, to assign within the meaning of a statute, you have to assign significant overall duties. So for example, in the context of nurses, assigning a less senior nurse to a patient can constitute assignment. But here, there's insufficient evidence that the LPNs do that independently or that they do it using independent judgment, which is required for all of the statutory factors. Because the only evidence in the record is that when LPNs are assigning part-time and float CNAs, so first of all, full-time CNAs always have the same residence. They're not assigned residence discretionarily at all. But when a discretionary assignment needs to be made, LPN Mabachi, the only specific concrete considerations he could provide were first of all, the gender preference of the patient, which is spelled out in the resident care plan and is a kind of routine clerical decision. And secondly, the equalization of workloads, so making sure the CNAs are assigned where roughly equal amount of work. And under established board law, those do not require independent judgment. Before you go on, I just wanted to try and understand a little bit more about the hierarchy. There are 15 LPNs that we're talking about here, right? Correct. And so what is the ratio of LPN to CNAs? So it varies throughout the day, your honor. So during the daytime shift when there's the most activity, I believe there's typically, so throughout the day there's two LPNs on each floor. And during the daytime shift, I believe there's five to six CNAs. Whereas during the overnight shift, there might be four or five for the entire building. And so during the day for the entire building, you might have, I guess, 10 to 12 because you have two units. So the lowest ratio would be during the day when you have two LPNs on a floor and then five to six CNAs. Whereas at night, you might have two LPNs and only two or three CNAs working on the same floor together. So if there's a sort of a, it's set up the way you have it, where the LPNs have certain tasks, the CNAs have certain tasks, and the assignments are sort of predetermined, that's what you're saying? Yes. But then they can vary during the day depending upon circumstances, correct? I mean, somebody expresses a desire to have a particular, some resident expresses a desire to have a particular CNA. Somebody's got to make that decision. That's correct, your honor. And those were the handful of examples in the record were, for example, if a resident requests a different CNA or if a family member requests that a resident receive an unscheduled shower. And the board acknowledged those situations are hypotheticals, but what the board reasonably found is that for the LPN to then discretionarily assign that does not require independent judgment. Because that does not require weighing, say, the expertise of the CNA or the acuity of the patient or any kind of expertise or weighing of data or independent analysis. That essentially just a clerical or routine administrative function where the LPN would say, if so, perhaps this CNA is available to do this right now, or this CNA is already assigned to this patient, so they will do the unscheduled shower. There's that kind of discretionary decision making. But something which I think is important to emphasize is that independent judgment under the act is a term of art, which the Supreme Court has recognized is an ambiguous term. And in the Kentucky River case in 2001, the Supreme Court held that first of all, the courts are required to defer to the board's reasonable interpretation of that term. And secondly, what's very important here is that not every decision which is discretionary constitutes independent judgment. The purpose of the supervisory exclusion in the act was to distinguish between statutory supervisors who are exercising genuine management prerogatives from lower level employees who may have some type of supervisory authority such as lead persons or straw bosses who may be directing other employees but don't have sufficient independent judgment and don't rise to the level of having all of their rights under federal labor law stripped from them. So the Supreme Court has recognized that you have employees who make discretionary decisions and may direct others, but it does not rise to the level of being a statutory supervisor. And the Supreme Court's recognized that the board in the first instance is the expert agency who's supposed to make that call and courts are supposed to defer. If there are no additional questions, thank you. Mr. Godfrey, you've reserved two minutes. Yes, Judge. I was trying to find the evidence of the record. It is relatively rare, but it does happen that LPNs are the top person in the building. The testimony in the record related to circumstances where it was a night shift and another supervisory employee, a higher level supervisor, wasn't present. Surely, because in one instance where, or a time when, because somebody's sick or because all of a sudden a resident nurse has to leave for an emergency or something like that. And there's circumstances occurring at the nursing facility that require some actions and some competent decisions, and an LPN steps in and that's not the same thing as an assignment, a permanent assignment, is it? No, it's not, but it's an example of circumstances where they may be the top person. There's a premium- That would make, even within the CNA ranks, you might have a CNA suggesting to another CNA. You know, can you cover this place and I'll cover this, and they do it. I mean, there's some play in the joints there, it seems to me. It's a question of what the overall system is, isn't it? Yeah, I think the more important thing is to step back. They don't need to be the top person in the building to be an effective supervisor, obviously. Lots of companies have people other than, or supervisors who aren't the top person in the building. Contrary to the- You're not arguing that just because conceivably the circumstance could occur where the supervisory personnel become sick or are called away and are out of the building during the overnight shift, that that makes the- I'm not, I'm arguing that it in fact has happened where these folks exercise supervisory authority and happens on a regular basis. Contrary to the board's position, the testimony in the record established that with respect to assignments, it's not perfunctory. It's not simply occasional showers. Mr. Babacki testified that we consider the gender of the aid, specific requests from families, skills to CNA, as well as the acuity of the patient. He talked about the fill-in and assignment sheets, which are about half of the float each day that he's responsible for. How he would assign tasks, including showers and nourishments and all that kind of stuff. He also testified that he would base these decisions upon his judgment and what he thought was fair, CNA workload and their responsibilities and abilities. But the fact that there is evidence that would have supported the opposite conclusion doesn't mean that there wasn't evidence to support the board's conclusion. Well, all that needs to be established is that he has the authority to do these things and exercise- You're saying that if one person comes and testifies, I, an LPN, had the exercise this authority that the board cannot find otherwise? No, look, it's a credibility decision, etc. But at the end of the day, it was not just Mr. Mabacki. There was testimony from Deanna Vickia, from Ms. Stumpo. I think Judge LaValle is making the point that you're really arguing the wrong side of it. We've got to look at what the board found and what the evidence was that they had before them. And to see whether or not it was substantial in the sense that it was relevant, that relevant evidence upon which a reasonable mind might accept as a conclusion, to support the conclusion. And if the hierarchy is set up the way it is, why isn't that substantial evidence? So it's the- Notwithstanding the ability of LPNs to act in certain instances. Yeah, at the end of the day, the fact of the matter is that they had the ability to exercise this authority, and they did. The fact that there could be a more senior supervisor someplace in the building doesn't mean that they didn't actually exercise this authority. And just to address the question of the board's position and what we should be arguing, it's what the board said was that there wasn't substantial evidence that they were engaged in supervisory, that they engaged in any one of the statutory supervisory duties. Should the appellants establish that there is substantial evidence in the record that they did any one of these things, that's sufficient. It's not just that the board, there's no burden of proof for them to try to establish the absence of this stuff. They just didn't appreciate the import of the clear examples of supervisory activities that were undertaken. The board's explanation of its decision was that there is no respectable or substantial evidence supporting- That was their position, that there is not substantial evidence in the record supporting the supervisory status of these folks. And it's the appellant's position that there, in fact, is extensive and substantial evidence of such activities in the record. Thank you, Mr. Godfrey. Thank you both.  Thank you, your honors.